FILED

02/26/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 1, 2019 Session

**STATE OF TENNESSEE v. RONALD TAYLOR**

**Appeal from the Criminal Court for Shelby County**
**No. C17-04240     J. Robert Carter, Jr., Judge**

_____

**No. W2019-00502-CCA-R3-CD**

_____

A Shelby County jury convicted the Defendant, Ronald Taylor, of first-degree premeditated murder, and the trial court imposed the statutorily required life imprisonment sentence. On appeal, the Defendant challenges the: (1) denial of his motion to suppress; (2) sufficiency of the evidence; (3) omission of a jury instruction; and (4) admission of an officer's testimony regarding a video prior to admission of the video into evidence. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. THOMAS T. WOODALL, J., filed a separate concurring opinion.

Phyllis L. Aluko, District Public Defender, and Barry W. Kuhn, Assistant District Public Defender, Memphis, Tennessee, for the appellant, Ronald Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen C. Baity and Scott P. Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a workplace shooting. While the business was closed for lunch on March 17, 2017, the Defendant shot and killed his manager. Following the investigation of the shooting death of the victim, a Shelby County grand jury indicted the Defendant for the first degree premeditated murder of Travis Brandt. The Defendant filed a motion to suppress the Defendant's statement, a gun, and a surveillance video. The trial court denied the motion after a hearing. The case then proceeded to trial. As

the Defendant raises issues from both the suppression hearing and the trial, we summarize separately the evidence presented at both.

## A. Suppression Hearing

The Defendant filed a motion to suppress his March 18, 2017 statement to the police and items obtained as a result of the statement. The Defendant contended that the police did not have probable cause for the Defendant's arrest and also challenged the voluntariness of the statement. At a hearing on the motion, the parties presented the following evidence: Memphis Police Department ("MPD") Detective Fausto Frias testified that he was involved in the investigation of the March 17, 2017 homicide that occurred at a business called Plasma Biological Services ("PBS").

At the time he was dispatched to the scene, Detective Frias did not have any information regarding a suspect, but after speaking with nine to twelve employees, he began to develop the Defendant as a possible suspect. Detective Frias learned that the Defendant had been at work on March 17, 2017, but was the only employee who did not return from the lunch break. He also learned that the Defendant was facing disciplinary issues at work. Further, employees had attempted to contact the Defendant in the wake of the shooting, but he had not responded. Based upon this information, Detective Frias obtained information about the Defendant's vehicle, a silver Chrysler Pacifica, and surveillance video from surrounding businesses. The surveillance video footage showed the Defendant's vehicle leaving the area shortly after the 911 call about the shooting was placed. Based upon this information, the Defendant was detained for investigative purposes at approximately 5:30 p.m. at Baptist East Hospital, where he was with "a relative that was not feeling well."

Detective Frias testified that the Defendant was transported to the homicide office where he agreed to speak with investigators. He signed an Advice of Rights form and then Detective Frias and Sergeant Mullins interviewed the Defendant. Initially, the Defendant denied any involvement in the shooting. Detective Frias recalled that the Defendant appeared to be "intelligent" and showed no signs of drug or alcohol influence. The Defendant was provided with food and allowed bathroom breaks. Detective Frias denied any sort of abuse or coercion during the interview. He further denied discussing any type of leniency with the Defendant.

Detective Frias identified the Defendant's statement admitting his role in the shooting. The statement was reduced to writing, and the Defendant reviewed the document and made corrections. The Defendant signed the statement at 4:57 a.m., March 18, 2017. At the time the statement was given, Detective Frias showed the Defendant a photograph of the victim. On this sheet, the Defendant wrote the victim's name and "I

shot [the victim] because he has killed people associated to me and my family and friends and has made numerous attempts on my life as well as my families [sic] and he threats [sic] to kill me." The Defendant signed the photograph and dated it March 18, 2017, 3:36 a.m. The detective also provided the Defendant with a still photograph from the surveillance video. The Defendant identified in writing the vehicle leaving PBS shortly after the 911 call as his "truck."

On cross-examination, Detective Frias explained that there were handwritten portions on the typed statement because the Defendant reviewed the statement carefully and wrote notes clarifying some of the areas where he did not agree with the wording. Detective Frias stated that, during the course of the interview, the Defendant agreed to take the officers to the location where he had hidden the PBS surveillance system taken after the shooting, and the murder weapon. Detective Frias denied ever having to awaken the Defendant during the course of the interview.

MPD Detective Kevin Baker testified that Detective Frias asked him to conduct the initial portion of the interview with the Defendant, which involved review of the *Miranda* rights. Detective Baker verbally advised the Defendant of his rights and then provided him with an Advice of Rights form. Detective Baker inquired about the Defendant's educational level (the Defendant had attained a college degree) and then documented 8:58 p.m. as the time he began reviewing the rights, and 9:03 p.m. as the time the Defendant signed the waiver of rights form. Detective Baker recalled that the Defendant did not appear to have any difficulty understanding his rights. He further noted that the Defendant did not appear to be intoxicated and that the Defendant denied any drug or alcohol influence. In Detective Baker's opinion, the Defendant appeared "alert" and "attentive." Detective Baker spoke with the Defendant for approximately thirty minutes, during which the Defendant denied any involvement in the shooting.

After the hearing the trial court made the following findings:

[Defense counsel argued] that [the police] didn't know it was [the Defendant]'s vehicle until [the Defendant] confirmed it later. And I'm going to submit to you, Detective Frias was pretty clear on that. The other employees identified that as [the Defendant]'s vehicle, it was confirmed. Detective Frias I think truthfully said he didn't know [the Defendant's] vehicle from anybody else's but for those things. That in and of itself might not be probable cause.

The fact that [the Defendant] has what could arguabl[y] be called a motive, he maybe thinks he's about to be fired or unfairly be fired, that's a motive. In and of itself that might not be enough to rise to probable cause.

The fact that he was at work that day and all other employees after this shooting come back, are interviewed and cooperate with the police. And . . . not only did [the Defendant] not come back, he couldn't be contacted, he didn't -- so I'm taking this as a -- it wasn't like he called in and said no, I'm not going to come back from lunch, I'm going to go check on my relative at the hospital and all that sort of thing as one might expect. So that's not just his not coming back but his suspicious, in my book, not coming back without letting anybody know and [n]ot being able to be reached. It's the combination of all those things. The employees identifying his vehicle. Him not coming back.

. . . .

But I think there was absolutely sufficient probable cause for [the police] to go and detain [the Defendant], sufficient to investigate, you know, this crime. And he was detained and advised of his rights, which I'm finding, you know, the record shows that he had indicated that he understood and he's got a . . . college education and all. And that he chose voluntarily to make a statement and I think the voluntariness is almost demonstrated by the statement in that he not only gave the statement that they had documented but he went to elaborate pains to clarify his position on that matter.

So I guess, I think Detective Frias used the term, I don't know whether consciously or not, but the totality of the circumstances they [ ] certainly indicate . . . sufficient grounds to detain [the Defendant] without a warrant at that point to investigate. And then, of course, the subsequent confession and leading to the evidence, and I don't know whether that's tied up later or not, but what they think is [ ] more incriminating evidence would certainly be sufficient to allow the admissibility of that evidence.

## B. Trial

At trial, PBS employee Sweta Desai testified that PBS employed nine people in March 2017: five technicians, three quality assurance employees, and a manager. Ms. Desai said that employee work schedules varied slightly but generally the work day was from 7:00 a.m. to 5:00 p.m. She said employees accessed the building with a key. Ms. Desai recalled that, on March 17, 2017, she arrived at work between 8:00 and 8:30 a.m. Ms. Desai spoke with the Defendant between 9:00 and 10:00 a.m. that day. The Defendant asked Ms. Desai if she was leaving the building for lunch, and Ms. Desai told

him no. Ms. Desai found this a little "surprising" because the Defendant had never inquired about her lunch plans.

Ms. Desai testified that the Defendant began working at PBS a few months after she began in 2012. The Defendant worked at PBS from 2012 to 2017. In 2015, the Defendant voluntarily resigned, but the victim later rehired the Defendant. Ms. Desai confirmed that she had observed interactions between the victim and the Defendant, and she said that the two men "g[o]t along." She had never witnessed them arguing or in a disagreement. Ms. Desai denied ever witnessing the victim threaten the Defendant. She recalled that the victim would occasionally give the Defendant lunch money. She said that both men were smokers, so the victim would give the Defendant cigarettes and "old clothes."

Ms. Desai identified a map of the building layout and the location of the reception area in relation to the victim's office on the map. Ms. Desai also identified a photograph of a vehicle as the Defendant's car. Ms. Desai confirmed that there was a surveillance camera in the reception area that connected to a DVR that was located in the victim's office. Ms. Desai viewed still photographs taken from the surveillance video on March 17, 2017. She identified the man in the pictures as the Defendant.

Ms. Desai testified that in the early afternoon, "around lunchtime," she heard two or three gunshots. Upon hearing the gunfire, Ms. Desai closed her office door, got under her desk, and called 911. Ms. Desai remained under her desk until the police arrived approximately ten minutes later. The parties stipulated that on March 17, 2017, at approximately 1:49 p.m., a 911 call was made to MPD Communications.

PBS Quality Assurance technician Darryl Brewster testified that he arrived at work at "a little after eight" on the morning of March 17, 2017. On his way to the break room to get his lunch, the Defendant asked Mr. Brewster if he was going to the hospital. Mr. Brewster explained that he had been experiencing back pain at the time, but he told the Defendant that he planned to go after work. After the brief exchange, the Defendant went into the processing lab while Mr. Brewster got his lunch from the break room before returning to his office.

Mr. Brewster testified that at the time of these events there was "construction going on." Mr. Brewster heard a "pow, pow, pow" after returning to his office but assumed it was "some bubble wrap" or a "nail gun." He did not become aware of the shooting until police officers removed him from his office.

On cross-examination, Mr. Brewster testified that the Defendant had trained him when he began working at PBS. Mr. Brewster opined that the Defendant was a good

employee and that Mr. Brewster never saw the Defendant exhibit "violent characteristics." Mr. Brewster had observed the Defendant and the victim interact and saw no indication of tension between these two men that might result in a shooting. Mr. Brewster described the hours leading up to the shooting as a "regular day" at the office.

MPD Officer Gary Horn was the first responder on the scene. He arrived at PBS approximately five minutes after the dispatch. Once Officer Horn's lieutenant arrived, the officers entered and cleared the building. Officer Horn wore a "body cam" during the entry of the office building. This recording was introduced into evidence.

MPD Officer Jeffrey Garey reported to the crime scene and collected evidence. He identified a photograph of a spent bullet cartridge located on the hallway floor. He also identified photographs of areas the police determined were "possible projectile ricochets" and five spent bullet cartridges or spent bullets that were collected at the scene. Police found a spent bullet cartridge to the left of the victim's head. Officer Garey also reported to an apartment complex on Amy Lane where he photographed and collected evidence from a tree line adjacent to the complex. The items included a digital video recorder and a black and silver colored pistol with the magazine removed. Officer Garey recalled that the gun and magazine were wrapped in a blue blanket. The magazine had five live rounds in it and there was one "live bullet" that was "loose" in the blanket.

MPD Sergeant Billy Byrd testified that he was present at PBS as employees returned from the lunch break. Tasked with identifying all PBS employees, Sergeant Byrd found that the Defendant was the only employee who did not return from the lunch break. Later that day, Detective Frias instructed Sergeant Byrd to obtain a residential search warrant for a residence located on Amy Lane. The Defendant had disclosed to officers that when he did not sleep in his car, he stayed at this apartment. The Defendant's mother was at the apartment at the time of the execution of the search warrant, and she identified various items that belonged to the Defendant. After returning to the homicide office, Sergeant Byrd learned that the Defendant had offered to show the police where he had hidden the PBS DVR and the murder weapon.

Sergeant Byrd escorted the Defendant to Amy Lane. The Defendant directed Sergeant Byrd to a wooded area next to the apartment complex. Sergeant Byrd looked in the area with a flashlight but, due to the foliage, could not see anything. Sergeant Byrd adjusted the Defendant's cuffs so that the Defendant could help with the search. The Defendant went in to the area and brushed away "the first layer of leaves" revealing a blue towel. Sergeant Byrd "resecured" the Defendant's handcuffs and returned him to the patrol car while the Crime Scene Investigation unit photographed and then collected the evidence.

Patricia Lewis testified that she was the Payroll Human Resources Manager at the PBS corporate office. Ms. Lewis confirmed that the employee records she provided to the State showed that the Defendant was first employed at PBS in November 2012. Thereafter, the Defendant voluntarily resigned on December 1, 2015, and was re-hired in 2016. About the Defendant's disciplinary work record, Ms. Lewis testified that the Defendant received a verbal reprimand on June 18, 2013, consisting of a warning "to refrain from horseplay in the work area." The Defendant was suspended from work on April 24, 2014, because the Defendant was found lying on the floor in the conference room, with the lights off, watching a video on his phone when he should have been working. The Defendant was again suspended on October 13, 2014, for sleeping "in the back storage room" during work hours. The Defendant also received a written warning on July 1, 2015, for defacing company property. On October 28, 2013, the Defendant received a written reprimand for being tardy for the bi-weekly shipment three consecutive times. On July 14, 2016, the Defendant received a "coaching session for tardiness." Ms. Lewis explained that after ten "points" assessed for attendance, an employee would be terminated. Ms. Lewis testified that each tardy equaled a half of a point. The Defendant received a verbal reprimand for his seventh tardy on August 30, 2016, and a written warning for "eight and a half points" on January 30, 2017.

On cross-examination, Ms. Lewis testified that, on November 8, 2013, the Defendant received a pay raise based upon a favorable performance review. The Defendant received another pay raise on December 3, 2014, noting that he continued to do good work and was a good employee.

MPD Officer James Fort testified that he received the DVR system related to this case with a request for extraction of any recordings on the machine. Officer Fort found video from the time indicated by investigators and downloaded the recordings to a USB drive before transferring the recording to a DVD format. The time stamp on the recording showed a time that was not within the timeframe of the homicides. On cross-examination, Officer Fort agreed that he did not know how the time was initially input into the surveillance system. The time stamp on the recording showed a time that was not within the timeframe of the homicides, but Officer Fort surmised that the time offset on the time stamp was due to daylight savings time.

MPD Detective Arrington testified that he was assigned the task of retrieving any video evidence related to this crime. Upon initial inspection, the detective found that the DVR component of the surveillance system had been removed. Detective Arrington then began to seek surveillance footage from surrounding businesses. One such business was J & M Automotive Detailing Center, located to the west of PBS. This business had several surveillance cameras, and Detective Arrington obtained video recording from their system. Detective Arrington identified the disc of video footage from J & M

Automotive Detailing Center ("J & M video"). Detective Arrington viewed the footage pursuant to his orders to look for a silver Chrysler Pacifica leaving the area "around the two o'clock hour," and found that a silver Chrysler Pacifica left PBS during the identified timeframe.

Defense counsel objected to the witness testifying about the contents of the recording without the recording being admitted. The trial court responded that the detective was only testifying to what he observed, and the defense responded that the Best Evidence Rule required that the recording be admitted before any testimony. Defense counsel confirmed with the trial court that he was still maintaining his prior objection to the introduction of the J & M video. The trial court concluded that the detective could testify as to what he saw during the course of his investigation. The State then asked Detective Arrington to identify the recorded disc as containing the same footage as he viewed "on location" at J & M Automotive Detailing Center. The trial court admitted the video into evidence over the Defendant's objection.

The State played the recording for the jury. Detective Arrington noted the portion of the video where a Chrysler Pacifica was shown leaving the area. He testified that he created a still photo of the Chrysler Pacifica from the video, and the photograph was introduced into evidence. On cross-examination, Detective Arrington agreed that the time stamp on the J & M video was incorrect. Detective Arrington explained that he knew the approximate time of the homicide so when he began searching surveillance footage, he noted the time on the DVR machine. The time was incorrect, so he calculated the time adjusting for the incorrect time display and found the footage showing the Chrysler Pacifica leaving the area. Detective Arrington testified that he notified Detective Frias that the time displayed on the DVR was accelerated by approximately thirteen hours and four minutes. The time displayed on the J & M time stamp was 2:55 a.m. on March 18, 2017. The video clearly depicted footage taken during daylight. Considering Detective Arrington's calculated adjustment, the approximate time was 1:51 p.m. on March 17, 2017, consistent with the daylight viewed on the video.

Detective Frias, the lead investigator, testified consistently with his testimony at the suppression hearing about the development of the Defendant as a suspect. Detective Frias said that on the day of the shooting, the Defendant was located and detained at Baptist Hospital. He explained that the Defendant had taken his mother to the hospital because she was not feeling well. The Defendant was transported to the homicide office shortly after 6:00 p.m. Sergeant Baker conducted the initial portion of the Defendant's interview at around 8:00 p.m. The Defendant signed and dated the Advice of Rights form at 9:03 p.m. The Defendant was given food at 8:30 p.m., and Detective Frias talked with the Defendant at 1:15 a.m. for about an hour.

Detective Frias testified that, during his interview with the Defendant, he confronted the Defendant with some of the evidence that the police had obtained. The Defendant provided a statement that corroborated information learned during the investigation and admitted to killing the victim. The police "went and retrieved some evidence" and took a typed statement from the Defendant. The Defendant reviewed the six-page typed statement and made corrections in his own handwriting and initialed each page after reviewing it. The Defendant completed his review of the statement at 4:57 a.m. Detective Frias read the Defendant's statement aloud for the jury as follows:

Q: Did you know [the victim], and if so, how do you know him?
A: I worked for him. He's my manager.

Q: Do you know [the victim] by another name?
A: No.

Q: How long have you known [the victim]?
A: 4 years.

Q: Are you responsible for this murder?
A: Yeah.

Q: How are you responsible for [the victim]'s murder?
A: I shot him.

Q: Was there anyone else there with you during this murder?
A: Yes, Sweta Desai and Darryl Brewster.

Q: Did Sweta Desai and Darryl Brewster help you in any way commit this murder?
A: No. They were just in the building working.

Q: Why did you murder [the victim]?
A: It was self-defense and fear for my family.

Q: Describe the weapon that you used to murder [the victim]?
A: A small gun, black and gray in color, a semiautomatic, I don't know the caliber.

Q: Who is the owner of the gun you used to kill [the victim]?

A:    I believe it's the young lady, (Jessica Tucker), that I stayed with father's gun.

Q:    Where is the gun at now?
A:    Somewhere by my mom's.  I'll take you and show you where it is.

Q:    How many times did you shoot [the victim]?
A:    I don't even know, more than once.

Q:    Describe what you were wearing at the time of this murder.
A:    I guess I would have had on my PPE, (Personal Protective Equipment), white lab coat, my khaki Timbaland [sic] boots that y'all got, maybe gloves on.

Q:    Tell me in your own words what happened before, during, and after this murder took place.

A:    The way this played out is, it's been a problem and tension between me and [the victim] but I didn't start them.  Within this last week, he had been walking by me and whispering my family members' titles, (etc. brother, mother, nephew, uncle) as in threats to kill them.  Last week there was a situation to where he stood in front of everybody and said that not only that he had tried to kill everybody but nobody would do anything due to the fact that he control with the fear.  That was within these last two weeks but I've been working there for the last 4 years.

My first year there was when I actually took notice that he was crazy.  We had a (QA) to get fired and ended up killed within a year.  The way it was described was that she blew out her own brain which is also one of the ways that the young lady that I visit cousin died cuz' when they can't get to you they get to anyone that's close to you.  After the second year, I got some friends on at my job, their names are Princess and Jerika.  The way this situation played out, I can't started messing off with [the victim.]  I noticed that if caught us fraternizing or playing with each other that [the victim] would get upset which ultimately led to more victims and family members or my friends.

It even got to a point where if we had a new chick in the building and would tell her no and that she couldn't associate with me.  Also,

there were instances where I could be standing in the freezer and [the victim] would bump up against my ass or butt in an attempt to grope because I turned down his advances, he would get even more upset. It got so bad, there was a lie told and so once the truth came out about the lie, [the victim] was upset with the person that told the lie and wanted me to kill them out of his own mouth, and I said "No," which also sparked a new wave of negative energy which is why you see the paper trails of bad attendance marked and disciplinary actions wasn't current. He would like hold it against me at one time.

That's what happened to Jerrica being fired. The last four years, I've been receiving threats from [the victim] about killing my family. Last week, [the victim] admitted in front of the entire staff that he had been trying to kill us. I spoke out about it and I said "I told y'all I wasn't crazy." That's when [the victim] said he controls with fear and that they would always gon' follow him because he controls with fear. Today, I woke up and grabbed the gun off the dresser because yesterday, [the victim] was whispering about offing my brother and my brother has a son and I didn't wanna get killed and he gonna kill my brother. Today I grabbed the gun and went to work and I shot him. I waited for everybody to go to lunch because I didn't want nobody to get hurt. Then, I walked by [the victim] office and I started shooting at him. I grabbed the camera modem, I guess the DVR and put it in some bushes near my mom's where the gun and clothes are.

I got in my car and drove my mom to the hospital. I told my mom that the mothaf**kas on my job was crazy. I had to ask him a question and he did this gun point thing with his finger at me earlier.

Q:    What was [the victim] doing when you shot him?
A:    On the computer.

Q:    Was [the victim] standing or sitting at the time that you shot?
A:    Sitting.

Q:    Was [the victim] armed with a weapon when you began shooting him?
A:    Not in his hand but in my mind because he had been killing mugs.

Q:      Explain what you mean "In my [mind] because he had been killing mugs?"

A:      I felt like my life and my family's life and any close friends' life was in danger.

Q:      Describe the vehicle you were driving at the time of this?

A:      A 2007 Pacifica, silver in color.

Q:      Who is the owner of the vehicle you drove?

A:      Me.

Q:      Where is this vehicle now?

A:      It was the last outside the hospital I figured y'all got into because y'all got my cell phone out.

Q:      Were you and [the victim] involved in any type of relationship?

A:      No, except for him trying to kill me.

Q:      Were you involved with anyone romantically at your job?

A:      No.

Q:      Have you and [the victim] ever been in a romantic relationship?

A:      No, but he tried to push up on me.

Q:      Explain what do you mean "[the victim] has tried to push up on me?"

A:      From groping in the freezer to actually grabbing a hand full of my genitals at one time. I kinda pushed him off of me and walked off. I didn't say nothing.

Q:      Have you reported to anyone in the company or to law enforcement any of the threats or sexual assaults [the victim] did to you before today?

A:      No. Because he said that he was the Human Resource person and he said he's the first person you go to because it's his building.

Q:      Did you stand over [the victim] after he was on the ground and shoot him?

A:      Nah.

Q:      Where were you standing when you were shooting at [the victim]?

- 12 -

A:    In the doorway.

Q:    How did you get the DVR out of the building?
A:    I put the Styrofoam container on top of the DVR.

Q:    Why did you take the DVR from the business?
A:    I thought that's what you do to keep the video from being seen[.]

Q:    Are you in or affiliated with a gang?
A:    No.


. . . .


Q:    Prior to this statement were you shown a single photo numbered 6?
A:    [The victim].  I shot [the victim] because he had killed people associated to me and my family and friends and has made numerous attempts on my life as well as my families and threats to kill me.


. . . .


Q:    Prior to this statement, were you shown a single photo number eight?
A:    Yes.  That's my truck when I was leaving.

Q:    Did you sign and date the photo?
A:    Yes.

The State asked Officer Frias to read aloud the handwritten additional information added by the Defendant.  The handwritten portion is as follows:

Is that they started to mess off when that happened, I took notice of how he would act towards me due to us fraternizing.  He would get upset and make rude comments or threats.  It even got to a point to where we had a new coworker and he was highly outspoken on his discontent of us associating. [H]e would tell her "no" and that she not to associate with me.  [The victim] would bump up against me intentionally, or grope my ass or penis because I would turn down his advances he'd get more pissed off.  It got so bad, there was a lie told on me and once the truth got out about the lie, [the victim] was upset with that person and wanted them killed, to which I replied "No" and [he] started writing letters to them to be careful and he said this out his own mouth.  Which sparked a new wave of negative

- 13 -

energy which is why you see the paper trails of bad attendance and disciplinary actions that weren't current. He'd like to hold it all against you at once. The last 2 years since their employment I've had to deal with death threats and attempts on my life on almost daily basis as well as my families. Today I woke with the concern for my family cause he was whispering previously about offing my brother and my brother just had his first child. I didn't want to wait to see if he was just being intimidating. Since people have been coming up dead. I grabbed the gun and went to work and it ended with me shooting him while everyone was at lunch. Its not that I was looking for trouble but honestly concerned for my family. I walked by his office and started shooting. [A]fterwards, I grabbed the DVR and hid it in the bushes at my moms. The last thing I remember is seeing him pointing his fingers in a gun shape and insinuating the matter of killing me.

On cross-examination, Detective Frias agreed that typed statements were not taken from all PBS employees who were at work on the day of the shooting. Detective Frias confirmed that, out of all the people the police spoke with at the scene, only the statements of Sweta Desai, Darryl Brewster, and Antonio Stewart were reduced to writing. Detective Frias stated that during the initial interview with Sergeant Baker, the Defendant admitted to being present when the shooting happened but did not admit to any role in the shooting. Detective Frias and Sergeant Baker reported their interview with the Defendant to Detective Frias at 12:30 a.m., and Detective Frias spoke with the Defendant at 1:15 a.m. Detective Frias agreed that he confronted the Defendant with the Defendant's PBS personnel file. He explained that one of the employees that had a management role in the company told the police that the Defendant "had a disciplinary history" and gave the police the file. Detective Frias said that the employee had indicated that the Defendant "was at the verge of being terminated." Detective Frias confirmed that he did not receive or request a personnel file for any other PBS employee.

Detective Frias testified that on the surveillance video from PBS, the Defendant can be seen attempting to leave and then returning to get the DVR. About the Defendant's allegations that the victim had killed another employee, Detective Frias stated that the Homicide Bureau documents "all deaths and overdoses and homicides" that take place in Memphis and that there was no record to corroborate the Defendant's allegation.

Tennessee Bureau of Investigation ("TBI") Special Agent Brock Sain testified as an expert in the field of firearms identification. Special Agent Sain examined the pistol, magazine, six 9 millimeter cartridges, four 9 millimeter cartridge cases and bullets recovered in this case. After concluding that the pistol was in "a normal operating

condition," he test-fired cartridge cases and found that the bullets recovered at the crime scene had been fired from the pistol.

Dr. Erica Curry, a medical examiner, testified as an expert witness in the field of forensic pathology. Dr. Curry performed an autopsy on the victim's body and found that the victim sustained four gunshot wounds and one "graze wound." Three of the four gunshot wounds were fatal wounds. Following the examination, Dr. Curry concluded that the manner of death was homicide.

The defense presented two character witnesses; both had known the Defendant for a long time and both testified that the Defendant was not a violent person.

Following this evidence, the jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a life sentence. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant challenges the: (1) denial of his motion to suppress; (2) sufficiency of the evidence; (3) omission of a jury instruction; and (4) admission of an officer's testimony regarding a video prior to admission of the video.

## A. Motion to Suppress

The Defendant asserts that the trial court erred when it denied his motion to suppress his statement and the evidence discovered as a result of his statement. He argues that he is entitled to suppression because the police arrested him without probable cause and because there was a lengthy delay before his probable cause hearing. The State responds that the officers had probable cause to believe the Defendant was involved with the victim's homicide, so the Defendant's arrest was lawful. As to the Defendant's assertion that there was a lengthy delay before his probable cause hearing, the State asks us to waive this issue because the Defendant failed to raise this issue with the trial court.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial

court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

### 1. Probable Cause

Tennessee Code Annotated section 40-7-103(a)(3) provides that an officer may make a warrantless arrest "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." Tennessee courts "make little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest." *State v. Herbert Lee Massey*, C.C.A. # 01C01-9406-CR-00218, 1995 WL 518872, at *4 (Tenn. Crim. App., at Nashville, Sept. 5, 1995) (citing *State v. Melson*, 638 S.W.2d 342, 350 (Tenn. 1982)), *no Tenn. R. App. P.* 11 filed. Probable cause for a warrantless arrest "exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense." *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Our Courts have also stated that probable cause may rest upon many factors, one of which is identification of the defendant at the scene when the offenses were committed. *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005); *State v. Claybrook*, 736 S.W.2d 95, 102 (Tenn. 1987).

When determining whether the police possessed probable cause, "the courts should consider the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information." *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014). Such a nexus exists when the officers are relaying information or when one officer directs another officer to act. *Id*. When determining the existence of probable cause, the courts should also consider the entire record, including the proof adduced at both the suppression hearing and the trial. *Id*. at 36-37 (citing *Henning*, 975 S.W.2d at 299).

The evidence does not preponderate against the trial court's findings. Law enforcement, working in concert, knew that the Defendant had been at work at PBS on

March 17, 2017. During the lunch break, most of the employees left the PBS building and learned of the victim's shooting death when they returned to the building from lunch. The Defendant was the only employee at work that day who did not return to work from lunch. Further, the Defendant did not respond to his colleagues' attempts to make contact with him following the shooting. As an employee at PBS, the Defendant was privy to where the DVR component of the surveillance camera was connected and stored and the DVR component was missing. Police officers were also aware of a possible motive for the murder because, at the time of the shooting, the Defendant was facing disciplinary actions that may have included his termination. Surveillance footage shows the Defendant inside the PBS building. Finally, police officers observed, on the surveillance video obtained from a nearby business, the Defendant's vehicle driving away from the PBS building shortly after the 911 call was placed. Based upon these facts and circumstances, we conclude that the police officers had reasonable cause to believe that the Defendant had murdered the victim. The Defendant is not entitled to relief as to this issue.

### 2. Unlawful Detention

The Defendant also claims that an unreasonable delay occurred between his arrest and his probable cause hearing before a judge or magistrate. *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975). The State responds that the Defendant has waived this challenge for failure to present it to the trial court. *See* Tenn. R. App. P. 36(a).

Pursuant to Tennessee Rule of Appellate Procedure 3(e), "the failure to file a motion for a new trial, the late filing of a motion for a new trial, and the failure to include an issue in a motion for a new trial results in waiver of all issues which, if found to be meritorious, would result in the granting of a new trial." *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (footnote omitted). In his reply brief, the Defendant responds that this issue was sufficiently presented to the trial court in his motion to suppress. The Defendant directs this court to "page six" of the motion. On this page, in the section identifying the issue as suppression of the physical evidence because it is "fruit of the poisonous tree," we find the sentence the Defendant relies on as a basis for his raising a *Gerstein* challenge. "While the Defendant was unconstitutionally detained, he provided his statement and it is therefore subject to suppression." We further note that a *Gerstein* challenge was not argued at the suppression hearing or the motion for new trial. We conclude that this issue was not sufficiently raised in the motion to suppress or otherwise and, therefore, the Defendant has waived our review.

The Defendant requests that we review this issue for plain error, but we conclude that consideration of the alleged error is not necessary to do substantial justice. Tenn. R. App. P. 36(b).

- 17 -

## B. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

- 18 -

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2014). A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014).

The evidence, viewed in the light most favorable to the State, showed that the Defendant was employed at PBS and the subject of multiple disciplinary infractions, resulting in possible dismissal. Either under the State's theory of the case or the Defendant's testimony, there was tension at work between the victim and the Defendant. As a result of the tension, on the morning of March 17, 2017, the Defendant decided to kill the Defendant and took a gun to work with him for that purpose. The Defendant inquired as to other employees' lunch plans and waited until most of the employees had left the building for lunch. He then went to the victim's office and fired his gun multiple times at the unarmed victim who was seated at his desk. The victim died as a result of the gunshot wounds. The Defendant then took the DVR machine associated with the surveillance system to avoid detection and left the premises in his car. The Defendant did not return from lunch or respond to attempts at contact from his colleagues. Based upon this evidence, a jury could find, beyond reasonable doubt, that the Defendant intentionally and with premeditation killed the victim. The Defendant is not entitled to relief as to this issue.

### C. Jury Instruction

The Defendant argues that the trial court failed to instruct the jury on the proper consideration of his statement to the police. The Defendant identifies Tennessee Pattern Instructions 42.11 and 42.12, pertaining to admissions against interest and confessions, that instruct the jury to consider the circumstances under which the confession was obtained. The State responds that the Defendant has waived his claim that the trial court omitted a jury instruction because he failed to request the instruction.

The record supports the trial court's statement at the motion for new trial hearing that it, "on more than one occasion said, 'Any request for instructions,'" and that the defendant "didn't ask for it." Additionally, the Defendant concedes in his brief that he never requested this instruction.

This court discussed the effect of a parties' failure to raise a contemporaneous objection to inaccuracies in or omissions from jury instructions in *Grandstaff v. Hawks*, 36 S.W.3d 482 (Tenn. Ct. App. 2000), where we noted

> parties who invite or waive errors at trial will not be entitled to invoke these errors to seek relief on appeal. *See* Tenn. R. App. P. 36(a) & cmt. a. The chief exception to this rule involves jury instructions. Trial courts have the duty to give accurate jury instructions. *See* Ladd v. Honda Motor Co., 939 S.W.2d 83, 93 (Tenn. Ct. App. 1996). Accordingly, Tenn. R. Civ. P. 51.02 provides that a party may seek a new trial because of an inaccurate instruction, even if it did not object to the instruction at trial. *See Rule v. Empire Gas Corp.*, 563 S.W.2d 551, 553 (Tenn. 1978).
>
> The issue . . . raise[d] on this appeal involves an error, as opposed to an omission, in the instructions. It [is] argue[d] that the trial court erroneously instructed the jury to include [an individual] in its allocation of fault. While [Appellant] did not object to these instructions during the trial, it took issue with them in its motion for new trial. Accordingly, it has preserved this error as required by Tenn. R. Civ. P. 51.02, and it can raise this issue on appeal.

*Grandstaff v. Hawks*, 36 S.W.3d at 489. In a footnote, the *Grindstaff* court noted that "[t]his exception applies only to erroneous instructions; it does not relieve a party of the responsibility to bring the trial court's attention to material omissions in the instructions." *Id*. at 489 n. 9 (citations omitted). In *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005), the Tennessee Supreme Court also distinguished between claims of inaccuracies in the jury instructions and omissions. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *Id.* at 58. (citing *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn.1996)).

Although the Defendant did raise this issue in his motion for new trial, the error complained of is an omission and not an inaccuracy in the jury instruction. Accordingly, the Defendant's failure to raise a timely objection to the alleged omissions precludes our

review of the issue. *See* Tenn. R. App. P. 36(a); *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006) (citing *State v. Cravens*, 764 S.W.2d 754, 757 (Tenn. 1989)).

## D. Best Evidence Rule

The Defendant argues that the trial court erred by allowing Detective Arrington to testify about the contents of the surveillance video before the video was introduced into evidence. The State responds that the Defendant's challenge is moot because he obtained his requested relief when the video was entered into evidence and viewed by the jury.

The admission of evidence is a matter within the trial court's discretion, and a decision to admit or exclude evidence will not be disturbed on appeal absent a clear abuse of that discretion. *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999).

The best evidence rule requires the production of the original audio recording to prove its contents unless the audio recording is shown to be unavailable for some reason other than the serious fault of the proponent. AMERICAN JURISPRUDENCE § 1049. Tennessee Rule of Evidence 1002 adopts this rule. Where, therefore, an original copy of an audio recording is available, and the proponent offers testimony about the contents of a recording, the best evidence rule is not offended as long as the copy of the audio recording is introduced at trial. *See State v. Willie Nathaniel Smith*, No. W2001-02973-CCA-R3-CD, 2003 WL 103206, at *6 (Tenn. Crim. App., at Nashville, Jan. 9, 2003), *no Tenn. R. App. P. 11 application filed*.

In this case, the State introduced the audio recording itself into evidence, thus the investigator's testimony did not offend Rule 1002's best evidence rule. As such the Defendant is not entitled to relief as to this issue.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE